## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| REBECCA ANN DOUGLASS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:09-cv-03124-FG3 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | MEMORANDUM AND |
| the Social Security Administration, | ) | ORDER |
| | ) | |
| Defendant. | ) | |

This is a proceeding to review a decision by the Commissioner of the Social Security Administration (SSA) denying plaintiff's applications for disability insurance benefits and supplemental security income benefits.

After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the SSA decision should be reversed.

### I.  PROCEDURAL BACKGROUND

Plaintiff, Rebecca Ann Douglas, seeks review of a decision by the Commissioner of the Social Security Administration ("Commissioner" or "SSA"), denying her applications for disability insurance benefits ("DIB")  under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a final decision of the Commissioner under Title II.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of final decisions of the Commissioner under Title XVI.

Plaintiff's claims were denied initially, and on reconsideration. On January 7, 2009, following a hearing, an administrative law judge ("ALJ") found plaintiff was not under a "disability" as defined in the Act. On April 22, 2009, the Appeals Council denied plaintiff's request for review. The decision of the ALJ stands as the final decision of the Commissioner.

## II. FACTUAL BACKGROUND

The administrative record shows the following.

Plaintiff, born November 2, 1974, is divorced and has two minor children. She has 15 years of formal education and previously worked as a nurse ("LPN") and waitress. She applied for SSI and DIB in October 2007[1], alleging she became unable to work on August 1, 2006 because of disabling conditions, i.e., Type 1 diabetes, diabetic neuropathy in her legs and feet, bipolar disorder, attention-deficit/hyperactivity disorder ("ADHD"), and depression.

### A. Medical Evidence

The earliest medical records in the file were generated while plaintiff was in the custody of the Nebraska Department of Correctional Services from December 15, 2006 through February 28, 2007.[2] (Tr. 273-295). Records from Region II Human Services explain that plaintiff was evaluated for treatment by alcohol and drug counselors on March 22, 2007. The initial assessment (Tr. 265)

---

[1]Plaintiff's DIB application advises that she previously applied for Social Security disability benefits in March 2007. The claim was denied and she did not appeal the decision. *See* Doc. 15-6 at p. 3.

[2]The medical records clerk's January 31, 2008 letter forwarding the medical records to the Disability Determinations Section states: "I have withheld only the mental health documents as they are kept separately in the mental health department." Although this letter suggests that the Nebraska Department of Correctional Services did have "mental health documents" pertaining to the plaintiff, it does not appear that they were requested by the SSA for use in this proceeding.

reflects that plaintiff's parents and/or children had turned her in for using and distributing methamphetamine.  At the time of the initial assessment, she was facing drug charges in Furnas County and Red Willow County, Nebraska, and had been charged with Child Neglect by HHS. Plaintiff was participating in counseling to fulfill a requirement of the HHS case plan.

Plaintiff had been diagnosed with Type 1 diabetes at the age of 4.

While in custody, plaintiff was hospitalized at Richard Young Hospital in Kearney, Nebraska and was transferred to the York Women's Prison for a three-month "safety hold." (Tr. 265).  While in custody, plaintiff had attempted suicide by hanging (*see* Tr. 292-293) and by stashing pills and overdosing.  On several occasions, she refused to take her medication, including insulin.  She reported having poor organizational skills in that she was behind on her legal paperwork and bills, although she had the money necessary to keep herself current.

Plaintiff reported that she began using methamphetamine at age 15 for weight loss, and used methamphetamine heavily for 6-8 months when she was 19.  She resumed using methamphetamine at age 31.  Plaintiff began using marijuana at age 17, but "'quit' (greatly reduced)" using marijuana for nursing school.  She reported using LSD from ages 18-21 and PCP at age 18-19.  Plaintiff also consumed cocaine from 2000-2006, about once a month, with some heavier periods of use.  She used alcohol from ages 15-17 but stopped when she noticed withdrawal symptoms becoming common.

The March 22, 2007 initial assessment resulted in a diagnosis of "Polysubstance Dependence, early partial remission," "Diabetes, Peripheral neuropathy, per client report," and a GAF of 46.  (Tr. 269).

A substance abuse evaluation dated July 19, 2007 (Tr. 253) reflects that plaintiff was then employed as a waitress, and had worked as a nurse at a nursing home prior to her legal incident. She reported more than 10 medical hospitalizations, all diabetes related. She also reported participating in outpatient mental health counseling in Sterling and Ft. Collins, Colorado, but left both programs before completion. She saw a psychiatrist in Ft. Collins for about one month and was prescribed Depakote. Plaintiff participated in anger management counseling in Sterling in 1996. (Tr. 256).

Plaintiff had an extensive history of substance abuse and dependence. She was, however, determined and highly motivated to complete all requirements necessary to regain custody of her children. Although residential treatment would be ideal, it was ultimately recommended that plaintiff continue with her outpatient programs because they had been successful to date.

Plaintiff was examined by Dr. Tamara Johnson on May 14, 2007. Surgically, plaintiff had had a tonsillectomy, two C-sections, a right carpal tunnel release, a cardiac catheterization, and wisdom tooth extraction. Plaintiff's illnesses included atypical Prinzmetal angina, history of a transient ischemic attack, Type I juvenile onset diabetes mellitus with neuropathy, varicose vein problems, and bipolarity.

Dr. Johnson's medical evaluation (Tr. 263-64) notes plaintiff's addiction problems and longstanding history of drug use and abuse. Plaintiff advised that she was abstinent and clean because she had gotten into legal problems and lost custody of her two daughters. Her medications were Lantus and Humalog (insulin), Lisinopril for kidney protection, Norco for pain of peripheral neuropathy, Zantac, Aspirin and Imdur. She had previously taken Neuroutin, Relafen, Cymbalta, Topamax and Keflex, but they caused her to break out in a  rash. (Tr. 263). Plaintiff reported

-4-

symptoms of depression, mind racing, impulsiveness, poor decision making, irritability, sleep disorders, and trouble staying on task. Plaintiff had smoked a pack of cigarettes per day for 14 years. She appeared to be in denial about how drugs have affected her and had poor judgment and insight. Dr. Johnson made the diagnosis of

| | | |
|---|---|---|
| Axis I: | 296.62 | Bipolar I Disorder, Mixed Episode, Most Recent Episode Mixed and Moderate Severity |
| | 304.80 | Polysubstance dependence |
| Axis II: | 301.90 | Personality Disorder, not otherwise specified with histrionic traits |
| Axis III: | | Juvenile onset insulin dependent diabetes mellitus, angina, peripheral neuropathy |
| Axis IV: | | Primary support, social environment, occupational, economic, access to health services, legal system and medical problems |
| Axis V: | | GAF – 48 |

Dr. Johnson saw plaintiff approximately 10 times between June 18, 2007 and December 3, 2007. The majority of Dr. Johnson's reports reflect a diagnosis of poorly-controlled bipolar disorder with severe mania. Various drugs were prescribed for plaintiff's bipolar condition, with limited success; side effects had interfered with plaintiff's ability to work as a medical aide at a nursing home. (Tr. 259). Medications prescribed for plaintiff's neuropathy also caused undesirable side effects. (*See, e.g.,* Tr. 252). By the end of July 2007, plaintiff started developing akathisia and it was apparent that she could not tolerate any of the antipsychotic drugs that had been prescribed. Lamictal and Topamax did not alleviate plaintiff's hyperactivity or mania, and the drugs caused plaintiff to feel overly sedated. (Tr. 247-49). In late November 2007, Dr. Johnson prescribed Strattera because it appeared that plaintiff might suffer from ADHD as well as bipolar disorder; however, the Strattera caused stomach pain.

-5-

Christopher Milne, PhD, completed a Psychiatric Review Technique ("PRT") on November 16, 2007 (Tr. 219-232) for Listings 12.04 (Affective Disorders), 12.08 (Personality Disorders) and 12.09 (Substance Addiction Disorders), including a Mental Residual Functional Capacity Assessment (RFC) (Tr. 272).[3]  Dr. Milne reported that the medical evidence of record ("MER") showed that plaintiff did have diabetes and peripheral neuropathy.  Dr. Milne also reported that plaintiff had medically determinable impairments of Bipolar Disorder (Listing 12.04), "Personality disorder, nos" (Listing 12.08), and substance addiction disorders (Listing 12.09).  He concluded, however, that although the plaintiff's conditions were severe, she had only moderate functional impairments and her impairments did not meet any listing.

The "Physical Residual Functional Capacity Assessment" completed by Dr. Glen Knosp on or about November 28, 2007, concludes that the severity of plaintiff's symptoms was not fully supported by the MER.  Plaintiff appeared to be able to perform light work that was simple or unskilled.  Although her condition was severe, it did not meet or equal a listing, and the plaintiff was not disabled.

The November 16, 2007 PRT and November 28, 2007 RFC were affirmed as written by Linda Schmechel, PhD and Dr. Roderick Harley, respectively, on February 2, 2008.  (Tr. 296-97).

Plaintiff was treated by a podiatrist, Dr. Robert Hinze, from April 2008 through November 2008.  She had symptoms of a neuritis and nail problems and had noted increasing numbness to the distal plantar aspect of her feet over the past several years.  Dr. Hinze's notes indicate that the

---

[3] "Listings" are the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Under 20 C.F.R. § 416.920a(e), the Commissioner's conclusions must be recorded on a standard form, called the Psychiatric Review Technique Form ("PRT").

-6-

condition was first noted five years ago, and the severity of the condition was stable.  (Tr. 323).  His diagnosis on May 7, 2008  was controlled diabetes mellitus, type I with neurologic manifestations; hallux valgus bilateral, soft tissue inflammation bilateral; callus bilateral; polyneuropathy in diabetes; and Achilles bursitis left.  Orthotics and diabetic shoes were prescribed.  Plaintiff continued to complain of neuropathy and was referred to a pain specialist.  (Tr. 319).

Plaintiff also experienced numbness in her hands.  She had continuous numbness in the left hand for about a year and, on May 29, 2008, underwent surgery to correct chronic severe left carpal tunnel syndrome.  (Tr. 299-311).  The surgery did result in a dramatic reduction in the numbness in her hand; however, plaintiff was experiencing chronic numbness and pain in both feet with stocking-like numbness occurring up to her mid-calf.  (Tr. 299).

The report of an evaluation performed by a psychiatrist, Dr. Mark Scanlan, on October 13, 2008 reflects that plaintiff had been working with Dr. Johnson for several years but could not seem to achieve a medication to help her problems with bipolar disorder and ADHD.  At that time, plaintiff was on intensive supervised probation over the next two years and saw a counselor weekly to maintain drug sobriety.  Dr. Scanlan noted that plaintiff had past problems with notable and severe methamphetamine use.  She had an associate's degree in nursing and practiced until 2006, when she lost her license.  During that time, plaintiff began dealing methamphetamine.  DSS stepped in and took her children in August 2006, and plaintiff began a heavy downward slide of methamphetamine use daily over nine months.  She was then arrested and placed at the Nebraska Correctional Center for Women for three months, during which time she had an apparent psychotic break.  She was released from prison in March 2007.

-7-

Plaintiff advised Dr. Scanlan that she worked her DSS case plan and got her children back in December 2007.  She was trying to get her life back on track, but struggled to maintain employment as she either became paranoid with her employer or co-workers or became extremely bored and restless with the jobs.  At the time of the evaluation, plaintiff was working two jobs.  She endorsed chronic paranoia and felt people were talking about her or making comments, particularly when she was in a large public place or gathering with multiple people.  Plaintiff had chronic poor sleep, averaging about 4 hours per night; frequent mood swings with manic and depressive type episodes; baseline hyperactivity; restless; poor concentration and attention; disorganization; and extreme trouble with reading comprehension.

During the October 13, 2008 evaluation, plaintiff was cooperative, alert, and fully oriented. She did exhibit moderate psychomotor restlessness and hyperactivity.  Her attention span was fair with some mild distractability.   There was no current evidence of hypomania or depression. Plaintiff's fund of knowledge was average.  Her thought processes were logical and goal directed. She was open to further help and treatment and would work on being compliant with prescribed medications and treatment.  Dr. Scanlan's diagnosis was: Type 1 Bipolar D/O, rapid cycling; ADHD, adult type; Amphetamine Dependence in full remission; Anxiety D/O NOS (with features of PTSD, GAD and Social Anxiety); Type 1 diabetes with diabetic neuropathy; and GAF of 52.

Plaintiff consulted Dr. Caroline Sorenson on October 15, 2008 for evaluation of painful diabetic neuropathy.  Dr. Sorenson noted that plaintiff had a history of insulin dependant diabetes mellitus for the last 30 years, and had several years of painful burning dysesthesias from the knee down.   Plaintiff had tried several medications, most of which caused a rash.  Dr. Sorenson's

diagnosis was diabetic peripheral neuropathy, neuropathic pain and bipolar disorder.  The medication Lyrica was prescribed, with some success.

Dr. Sorenson provided a Medical Source Statement dated December 18, 2008 (Tr. 349-353) stating that she first treated plaintiff on October 15, 2008 and last treated plaintiff on November 12, 2008 for neuropathic pain associated with peripheral neuropathy.  Plaintiff's symptoms were fatigue and extremity pain and numbness.  Plaintiff was not a malingerer.  Dr. Sorenson anticipated that plaintiff's neuropathic pain, taken alone, would cause her to be absent from work less than once a month; however, that assessment did not take into account plaintiff's diabetes and bipolar disorder. According to Dr. Sorenson, plaintiff's neuropathy was demonstrated by significant and persistent disorganization of motor function in two extremities, did result in sustained disturbance of gross movements, and did result in sustained disturbance of gait and station.  Dr. Sorenson described plaintiff's gait as "wide based and clumsy representing poor balance from the severity of the neuropathy."  Plaintiff was "independent with ambulation for community distances without an assistive device."  There was evidence of abnormal reflex, decreased sensation, and ataxic gait.  Dr. Sorenson anticipated that, in an 8-hour workday, plaintiff could sit for 8 hours at one time.  Plaintiff could stand or walk for a total of 3-4 hours  during an 8-hour workday, but could only stand or walk for 1 hour at a time.  Plaintiff would be able to continuously lift or carry one to 10 pounds; frequently lift or carry 11-20 pounds; and occasionally lift or carry 21-50 pounds.  It was likely that plaintiff would need to lie down or rest at unpredictable intervals during an 8-hour workday.  Plaintiff could not use either foot for repetitive movement for operating foot controls.  Dr. Sorenson's prognosis for

-9-

the plaintiff was "progression of neuropathy and continuation of chronic neuropathic pain."  (Tr. 352).

Dr. Scanlan's progress notes of November 18, 2008 indicate that plaintiff had seen Dr. Sorenson for pain issues, was placed on Lyrica, had a definite improvement in her pain control, and was then only taking Norco about 1-2 tablets daily.  Her mood control had improved, and she remained on Invega with no notable paranoia present.  Plaintiff continued to have strong cravings for methamphetamine but denied any drug usage relapse.

Dr. Scanlan provided a Medical Source Statement dated December 15, 2008 (Tr. 343-348). He had treated plaintiff twice, on October 13, 2008 and November 18, 2008 and, to the best of his knowledge, plaintiff was not using alcohol or drugs.  Plaintiff suffered from "Type 1 Bipolar, rapid cycling, ADHD adult type, Amphetamine Dependence in full remission, Anxiety D/O nos (with features of PTSD, GAO & social anxiety)" and Type 1 diabetes with diabetic neuropathy.  Plaintiff's signs and symptoms were identified as poor memory, sleep disturbance, mood disturbance, substance dependence, recurrent panic attacks, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, manic syndrome, and generalized persistent anxiety.

Dr. Scanlan opined that plaintiff was mildly restricted in the activities of daily living, moderately limited in maintaining social functioning, and had moderate deficiencies of concentration, persistence or pace.  She had three episodes of decompensation, each of extended duration.  Plaintiff had good to fair mental abilities and aptitude needed to do unskilled work (Tr.

-10-

347); fair mental abilities and aptitudes needed to do semiskilled and skilled work (Tr. 348); and good to fair mental abilities and aptitudes needed to do particular types of jobs (Tr. 348).

### B.   Administrative Hearing

#### 1.  Plaintiff's Testimony

The ALJ conducted a telephonic hearing on December 17, 2008.  (Tr. 22-52).  At that time, plaintiff was living in a mobile home with two children, aged 12 and 13, had a driver's license, and was able to drive.  She was 5' 7" tall and weighed 200 pounds.  She was able to take care of her personal grooming needs, with the exception of podiatry care.  She testified she was unable to keep up with her housework.  She did cook, and did  laundry, shopping, and some of the cleaning.  She sometimes mowed the yard but could not shovel snow.  She watched television about 2-3 hours per day, did not read, and did not spend any time on the computer, did not go to movies, and was not really able to attend church.

Plaintiff had an associate's degree in nursing (LPN), but her license was suspended because of her past drug use and failure to report it.  Problems with reading comprehension prevented her from pursuing any other kind of trade or vocational training.  She been in jail five or six times; the longest term was when she was confined for three months prior to trial.

Plaintiff applied for disability benefits, effective August 1, 2006.  She had worked since the alleged onset date and, at the time of the hearing, was working about 20 hours a week as a waitress.  She had previously worked about six years for a pool nursing agency but lost that job in August or September 2006.

-11-

Plaintiff testified she saw her general practitioner about once a month for diabetes, Dr. Scanlan about every other month, and a counselor every week. She reported problems with sitting, and could sit for about 30 minutes at a time. She could stand still about 10 minutes, but had to keep moving. She could walk for about 15 to 30 minutes before she needed to get off her feet. She estimated she could lift 25-30 pounds at one time, but had the carpal tunnel surgery on her left wrist. She could not do any of these things without medications. She had not yet experienced significant vision problems.

The bipolar disorder caused plaintiff to be compulsive and paranoid. For example, she would stay up for several days in a row and sleep for several days in a row. Her moods were either really angry or really happy. Medication did not help the paranoia but helped her to be "not so mean all the time." The bipolar disorder caused her to have problems relating to other people. She did not trust others and tried to avoid people, public places and large groups. She would have to take medications so she could go to the kids' schools or watch them play sports. Plaintiff testified she had bad difficulties with reading. She could not sit still long enough to read, much less comprehend what she was reading. She could watch television for 2-3 hours a day, but could only watch for 15-30 minutes at a time before she had to do something else. She also had racing thoughts, and would "hole up" in the house or take off to avoid stressful situations. She made very poor choices about money. For example, she would speed, get picked up for speeding, fail to pay her speeding ticket, and then get arrested. Plaintiff stated she had problems completing things that she started, especially if the task was detailed. The medications prescribed for bipolar disorder made her sleepy and dopey.

Plaintiff testified she checked her blood sugar anywhere from 2 to 8 times a day. At the time of the hearing, they were out of control and they were trying to adjust her insulin. If her blood sugar was too high, plaintiff did not think clearly, suffered from fatigue, and would have to rest with her legs elevated. She had burning pain in her legs and feet while standing and would have to elevate her feet two to four times a day. Stress, illness, and physical exertion made her diabetes worse. Heat and humidity would make her blood sugars go low.

Plaintiff testified she had to keep moving due to the diabetic neuropathy in her feet and legs. She had burning, stabbing, achy pain in her knee and took Lyrica and Norco for pain. The medications allowed her to be active or work a few hours at a time. Her feet were numb, but she could sense heat after a while. Her feet were generally cold. Problems with her legs and feet bothered her while driving because she had to keep moving her legs and had to stop often and take rest periods. For her diabetic problems, her doctors recommended that she "take it easy." She was no longer able to go hiking or shopping and could no longer sit still long enough to play cards.

Plaintiff was taking Lamictal, Invega and Concerta for her ADHD.

Plaintiff admitted she had major problems with methamphetamine from May through December 2006, and had experimented with drugs prior to that time. She had been clean and sober since December and was participating in counseling.

Plaintiff had worked numerous places as a waitress, but had a hard time holding a job longer than six months. As a waitress, she would occasionally have to lift loads of dishes weighing 25-30 pounds. As a nurse, she would have to lift people. In an average shift, she would have to lift up to 75 pounds about once or twice with assistance from other people.

-13-

### 2. Vocational Expert's Testimony

As to plaintiff's past relevant work, vocational expert ("VE") Cheryl Chandler testified that plaintiff's work as a licensed practical nurse should be classified at the medium level skilled work. Her work as a waitress, as performed, should be classified as medium level semiskilled work. Since plaintiff's nursing license was suspended, she did not have any transferrable skills from that job.

The ALJ first asked Ms. Chandler to assume a hypothetical claimant of the plaintiff's age, education and work history who could lift 20 pounds on occasion and 10 frequently; sit, stand and/or walk 6 out of 8 hours; and occasionally climb, stoop, kneel, crawl, crouch or crawl. Based on that hypothetical, The VE testified that such a person could not do any of the plaintiff's past relevant work as actually performed or generally performed in the national economy. The person could, however, perform jobs in food service or food service preparation, housekeeping at the light unskilled level, and custodial duties at the light unskilled level. These jobs were available in significant numbers in the regional and national economy.

The ALJ next asked The VE to assume the same hypothetical factors, but to also assume that the person would have to be able to sit or stand at will. She testified there were jobs in the national or regional economy that this person could perform, but to a much lesser degree. Light, unskilled jobs allowing for the option to sit or stand included cashiering, hand packaging, and production work.

Finally, the ALJ asked The VE to assume the same factors as in the first two hypotheticals, and to also assume that the person would have occasional problems maintaining attention,

-14-

concentration and pace.  She testified there were no jobs in the regional or national economy that this person could perform.

Responding to plaintiff's hypothetical question based on Dr. Scanlan's medical source statement, The VE testified that such an individual would not be able to do any of plaintiff's past work.

### C.   ALJ's Decision

Applying the five-step sequential evaluation process established by the Social Security Administration, *see* 20 C.F.R. §§ 404.1520(a) & 416.920(a), the ALJ determined:

**Step 1:**   Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011, and has not engaged in substantial gainful activity since August 1, 2006.

**Step 2:**   Plaintiff had the following severe impairments: diabetes, diabetic neuropathy, and obesity.  Claimant also had a non-severe bipolar disorder and a "not medically determinable condition" of ADHD.  (Tr. 15).

**Step 3:**   Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

**Step 4:**   Plaintiff had the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk 6 hours in an 8-hour work day; and occasionally climb, stoop, kneel, crouch, and crawl.  (Tr. 17).

**Step 5:**   Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

-15-

Based on these findings, the ALJ concluded that plaintiff has not been under a disability, as defined in the Social Security Act, from August 1, 2006 (the alleged onset date) through January 7, 2009 (the date of the decision).  (Tr. 20).

### III.  LEGAL ANALYSIS

In this proceeding, plaintiff contends the ALJ's decision should be reversed because (1)  the ALJ committed errors of law (1) by failing to find that plaintiff's bipolar disorder was a severe impairment under the Social Security regulations and rulings, and (2) by relying on an improper hypothetical question when examining the VE.

### A.   Standard of Review

The decision of the ALJ, which stands as the final decision of the Commissioner, must be affirmed if there are no errors of law, *see Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1151 (8th Cir. 2004), and it is supported by substantial evidence in the record as a whole, *see Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008).  The court must consider the entire record, including evidence that supports as well as detracts from the Commissioner's decision.  Although the court owes no deference to the Commissioner's legal conclusions, *see Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003), the court cannot reverse the Commissioner's decision simply because some evidence may support the opposite conclusion.  *Hamilton*, 518 F.3d at 610.

### B.   Discussion

Under the Social Security Act, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). Further,

> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.
> (B) In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.  If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. § 423(d)(2).

In deciding whether a claimant is disabled, the ALJ must follow a five-step sequential evaluation process, considering:

> 1) whether the claimant is presently engaged in a "substantial gainful activity;" 2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities; 3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations ...; 4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and 5) if the claimant

-17-

> cannot perform the past work, the burden shifts to the Commissioner to prove that
> there are other jobs in the national economy that the claimant can perform.

*Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (quoting *Kelley v. Callahan*, 133 F.3d 583,

587-88 (8th Cir.1998)).

> Step one requires the ALJ to determine whether the claimant is currently engaged in
> substantial gainful work activity. *See* 20 C.F.R. § 416.920(a)(4)(i), (b). If the
> claimant is engaged in substantial gainful activity, the ALJ will find that the claimant
> is not disabled. *See id.* Step two requires the ALJ to determine whether the claimant
> has a "severe impairment." 20 C.F.R. § 416.920(c). A "severe impairment" is an
> impairment or a combination of impairments that significantly limits the claimant's
> ability to do "basic work activities" and satisfies the "duration requirement." *See* 20
> C.F.R. § 416.920(a)(4)(ii), (c); *id.* § 416.909 ("Unless your impairment is expected
> to result in death, it must have lasted or must be expected to last for a continuous
> period of at least 12 months."). Basic work activities include, *inter alia*, "[p]hysical
> functions such as walking, standing, sitting, lifting, pushing, pulling, reaching,
> carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple
> instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision,
> co-workers and usual work situations," and "[d]ealing with changes in a routine work
> setting." 20 C.F.R. § 416.921(b). If the claimant cannot prove such an impairment,
> the ALJ will find that she is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). Step
> three requires the ALJ to compare the claimant's impairment or impairments to a list
> of impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). If the claimant has an
> impairment "that meets or equals one of [the] listings," the analysis ends and the
> claimant is found to be "disabled." *See* 20 C.F.R. § 416.920(a)(4)(iii). If a claimant
> does not suffer from a listed impairment or its equivalent, then the analysis proceeds
> to steps four and five. *See* 20 C.F.R. § 416.920(a). Step four requires the ALJ to
> consider the claimant's residual functional capacity to determine whether the
> impairment or impairments prevent the claimant from engaging in "past relevant
> work." *See* 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform
> any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20
> C.F.R. § 416.920(a)(4)(iv), (f). Step five requires the ALJ to consider the claimant's
> residual functional capacity, age, education, and past work experience to determine
> whether the claimant can do work other than that which he or she has done in the
> past. *See* 20 C.F.R. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant
> cannot do such work, the claimant will be found to be "disabled" at step five. *See id.*

*Walters v. Astrue*, 2010 WL 1292273 at *3, Case No. 4:09-cv-3150 (D. Neb. Mar. 29, 2010)

(footnote omitted). Through steps one through four, the claimant has the burden of showing that she

-18-

is disabled.  *Walters*, 2010 WL 1292273 at *4.   At step five, however, the burden shifts to the Commissioner to show that there are other jobs in the economy that the claimant can perform.  *Id*.

The Commissioner must consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling.  Thus, an ALJ must consider the combined effects of plaintiff's physical impairments and her mental impairments.

In this case, the ALJ chose to discredit or give little weight to all medical evidence of record supporting the proposition that plaintiff had a severe mental impairment of bipolar disorder.  For example, the "state agency doctors" who prepared the PRT and Physical RFC forms opined that plaintiff had a severe mental impairment, but the ALJ chose to give little weight to their opinions because the plaintiff only pursued mental health treatment as a mandatory requirement of her probation, and she had always been able to work in the past despite a long history of "mood swings."

The medical doctors who actually treated the plaintiff consistently diagnosed plaintiff with bipolar disorder, the symptoms of which are well documented in the treating physicians' records.  The ALJ disregarded the opinion of Dr. Scanlan because Scanlan only saw plaintiff twice.  The ALJ also dismissed Dr. Scanlan's diagnosis and opinions as "vague, conclusory, and inconsistent with the overall record." The ALJ also suggested that plaintiff consulted Dr. Johnson (who diagnosed bipolar disorder, severe mania, poorly controlled) only to fulfill her legal requirements after release from prison.[4]

---

[4]There is no evidence in the record that the plaintiff resumed using illegal drugs or alcohol after her release from custody.  Alcoholism and drug addiction have been eliminated as a basis for obtaining Social Security disability benefits. *See* 42 U.S.C. §§ 423(d)(2)) & 1382c(a)(3)(J).  Payment

Although the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, he also found that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible because they were "inconsistent" with the "state agency doctors'" RFC assessment.  In this regard, the ALJ did choose to adopt the findings of the otherwise discredited "state agency doctors" that the plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and/or walk 6 hours in an 8-hour work day, occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, frequently balance, never climb ladders, ropes, or scaffolds, and must avoid concentrated exposure to extreme cold and heat and hazards.

The ALJ concluded that the plaintiff was capable of a "wide range of activities of daily living" because plaintiff was then working 20 hours per week as a waitress and could cook 2-3 times a week, do laundry, mow the yard for 30 minutes, drive up to 4 hours, garden for 30 minutes, grocery shop 1-2 times a week, walk 6 blocks, stand 15-30 minutes, climb stairs with use of a handrail, and sit 10-30 minutes.  Thus, it appeared to the ALJ that plaintiff was capable of working despite her impairments "based on the fact that she has consistently maintained employment and is presently working, albeit part-time, and engages in a wide range of activities of daily living and hobbies."

The ALJ's opinion does not discuss the opinion of Dr. Caroline Sorenson that plaintiff would likely need to lie down or rest at unpredictable intervals during an 8-hour workday.  Dr. Sorenson could not assess the percentage of a workday during which plaintiff would experience pain, fatigue,

---

of benefits may be reduced or suspended if a claimant is incarcerated or confined by court order following criminal proceedings.  *See* 42 U.S.C. § 402(x).

or other symptoms severe enough to prevent plaintiff from maintaining attention and concentration. That condition was "completely subjective," and plaintiff's bipolar state would be a significant contributing factor. (Tr. 352). Dr. Sorenson's prognosis for the plaintiff was "progression of neuropathy and continuation of chronic neuropathic pain."

A finding that an impairment is "not severe" may be made at Step 2 "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered ..." SSR 85-28 (available at 1985 WL 56856 *3). Considering the record as a whole, the court concludes that the ALJ's decision reflects errors of law and is not supported by substantial evidence. By emphasizing the plaintiff's strengths and discounting her problems, the ALJ did not depict an accurate picture of plaintiff's bipolar disorder.

> A person suffering from the disorder has violent mood swings, the extremes of which are mania–a state of high excitement in which he loses contact with reality and exhibits bizarre behavior–and clinical depression, in which he has great difficulty sleeping or concentrating, has suicidal thoughts and may actually attempt suicide. The condition, which varies in its severity, see American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 297-98 (4th ed. 2000), is treatable by antipsychotic drugs and other medications. Sophia Frangou, "Advancing the Pharmacological Treatment of Bipolar Depression," 11 *Advances in Psych. Treatment* 28, 31-33 (2005). But many patients do not respond well to treatment, or have frequent relapses. See, e.g., Kaan Kora et al., "Predictive Factors for Time to Remission and Recurrence in Patients Treated for Acute Mania: Health Outcomes of Manic Episodes (HOME) Study," 10 *J. Clin. Psychiatry* 114 (2008); Robert G. Bota, "Therapeutic Dilemmas in Treatment-Resistant Bipolar Patients," 101 *S. Medical J.* 584 (2008). "For many patients, the prognosis of bipolar disorder is not good, as the disorder is associated with frequent relapses and recurrences." Edward Watkins, "Combining Cognitive Therapy with Medication in Bipolar Disorder," 9 *Advances in Psych. Treatment* 110 (2003); see also *Kangail v. Barnhart,* 454 F.3d 627, 630-31 (7th Cir. 2006).

*Bauer v. Astrue*, 532 F.3d 606, 133 (7th Cir. 2008) (Posner, J.).

-21-

Here, all medical sources agree that plaintiff suffers from bipolar disorder. Plaintiff's symptoms and behaviors were consistently documented throughout the record, and they were symptoms and behaviors of the type that are not conducive to full-time employment. Most of plaintiff's medical records reflect that her bipolar condition was uncontrolled or poorly controlled by medication. That the plaintiff could engage in the limited personal and social activities emphasized by the ALJ is of little significance: "This is just to say that the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days." *Bauer*, 532 F.3d at 608. "A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job." *Id.* at 609.

The court finds that the plaintiff's bipolar disorder is a severe impairment.

The court further finds that the ALJ failed to properly consider the plaintiff's bipolar disorder in combination with plaintiff's diabetic neuropathy. The hypothetical given to the VE that most accurately depicts the plaintiff's impairments was the third: to assume a hypothetical claimant of the plaintiff's age, education and work history

- who could lift 20 pounds on occasion and 10 frequently; sit, stand and/or walk 6 out of 8 hours; and occasionally climb, stoop, kneel, crawl, crouch or crawl;

- who would have to be able to sit or stand at will; and

- who would have occasional problems maintaining attention, concentration and pace.

-22-

The VE testified that there were no jobs in the regional or national economy that such a person could perform.  Thus, the court finds that the Commissioner did not meet the burden at Step 5 of proving that there are jobs in the national economy that the plaintiff can perform.

## IV.  CONCLUSION

The court concludes that the clear weight of the evidence leads to a determination that Rebecca Ann Douglass was disabled within the meaning of 20 C.F.R. Part 404, Subpart P, Appendix 1,  from August 1, 2006 through January 7, 2009.  The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing.  42 U.S.C. § 405(g).  In this case, the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits," and an immediate order granting benefits without remand is appropriate.  *Davis v. Astrue*, 2008 WL 130778 at *5, Case No. 06-4106 (N.D. Iowa Jan. 15, 2008) (citing *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991)).

Accordingly, the decision of the Commissioner is reversed, judgment will be entered for the plaintiff, Rebecca Ann Douglass, and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED December 21, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett, III**
**United States Magistrate Judge**

-23-